[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The sole issue in this municipal tax appeal is the fair market value of the plaintiff's marina. In determining the fair market value, the focus of this case centers on the issue of whether a replacement reserve for capital assets is an appropriate expense to use in valuing real estate using the income capitalization method.
The subject property is a marina owned by the plaintiff, Mystic River Properties, Inc., located on 56 Roseleah Drive in the Mystic section of Stonington. The land contains a boat storage yard and marina known as Brewer's Yacht Yard on approximately 2.87 acres of land. The marina contains 222 boat slips. The land is improved by bulkheads, piers, docks, pilings, floats, a main building containing a first floor office, repair and storage area and a rest room/laundry area, a pool, bathhouse, and a small gazebo. There is on-site parking for about 200 vehicles. The subject property is located in an MC-80 Marine Commercial Zone and is serviced by municipal water and sanitary sewers. The plaintiff's marina is located on a peninsula called Murphy's Point at the mouth of the Mystic River south of the CT Page 3852 Mystic River bridge with excellent access to the Mystic channel and Fisher's Island in Long Island Sound. The site is close to all major highways with good access to Interstate 95. U.S. Route 1 is less than one-half mile away. Connecticut Route 27 is one and one-half miles away. The marina is also close to the Mystic Seaport, a major tourist attraction.
The subject property was purchased by the plaintiff in July, 1986, for $1,290,000. Following the purchase in 1986, the plaintiff made significant improvements to the property. The plaintiff replaced deteriorated docks, piers, pilings, floats and bulkheads, and made other building improvements.
The plaintiff's appraiser, Marc P. Nadeau, valued the property at $1,850,000 using the income approach, and valued the property at $1,550,000 using the market sales approach to value. Because Nadeau recognized that there were few viable comparable sales, he relied primarily on the income approach. Nadeau found the final value of the subject property, as of October 1, 1994, to be $1,700,000.
The town's appraiser, Robert J. Flanagan, valued the subject property, as of October 1, 1994, at $3,116,000. Flanagan also relied primarily on the income approach. The assessor's valuation of this same property on the revaluation date of October 1, 1994, was $2,968,386.
We agree with both appraisers that the highest and best use of the subject property is its continued use as a dockyard and marina.
Both Nadeau and Flanagan developed the net operating income of the subject property from the actual income and expenses of the subject together with an examination of marina rentals in the market place. Their income and expense figures were fairly close. The basic disagreement between the two appraisers is Nadeau's use of an annual reserve expense for the replacement of capital assets of $180,446. This reserve is basically arrived at by taking the replacement value of the major assets, i.e. building, pool and spa, private road, bulkheads and 222 boat slips, and dividing this total amount by the life expectancy of the component parts. Although the plaintiff claims that this annual reserve expense is reflective of the historical capital improvements made by the plaintiff and other marina owners and operators in the Mystic area, we do not find this to be the case. CT Page 3853 First, a replacement reserve "provides for the periodic replacement of building components that wear out more rapidly than the building itself and must be replaced periodically during the building's economic life." The Appraisal Institute, TheAppraisal of Real Estate (10th Ed. 1992) p. 449. Second, in developing value using the income approach, the process should reflect the marketplace in the use of replacement reserve. Id. The extent of the replacement reserve "is based on the annual repair and maintenance expenses of the property." Id. We have not seen any credible evidence that the marina market uses a replacement reserve for the life of the capital assets. We note that plaintiff's operating statements were set up for income tax purposes, not for property valuation.
In developing an operating statement for income tax purposes, the marina owner's statement "is always net income after depreciation, interest expense, and income taxes. On the other hand, net income for purposes of capitalization is calculatedbefore such deductions. It is therefore advisable to present the owner's statement of income and expense as furnished and thus adjust the net income to exclude these charges." (Emphasis in original.) N. Haddad, "Appraisal of Marinas," The Encyclopedia ofReal Estate Appraising (3d Ed. 1978), p. 883. (See plaintiff's exhibit C.) Conceptually, there is a difference in accounting procedures between profit and loss accounting as compared to income and expense for appraisal purposes. Kinnard, William N., Jr., Income Property Valuation, (1971), p. 137.
When we consider replacement reserves as claimed by the plaintiff we are talking about an income stream providing for the recovery of a capital asset. Income Property Valuation, supra, p. 199. "[C]apital recovery payments are rarely estimated or sought for their own sake in income-property appraising. They are essential building blocks in the derivation of Capitalization Rates, however, and Capitalization Rates are important factors in the income capitalization process." (Emphasis in original.) Id. What these authorities tell us is that in the appraisal of real estate, using the income capitalization approach, only those expenses that relate to the production of income should be considered.
We agree with the town's argument that it would be unrealistic for an owner to set up a sinking fund and to place $180,000 each year into this fund for the replacement of capital assets. As the town points out, at the end of ten years, the CT Page 3854 plaintiff would have a fund of at least $1,800,000. Nadeau gave no consideration to the value of the reversion at the end of ten years, nor the income that would have been earned by the fund over the ten year period.
Analyzing the data provided by the parties in a light most favorable to the plaintiff, we use the plaintiff's computations as to income and expenses, which results in a net operating income of $270,280. However, since we disagree with Nadeau's use of $180,466 as part of the operating expenses, we deem it appropriate to add this amount to $270,280, for a net operating income of $450,746. We recognize that Nadeau included maintenance in the category of administrative and general overhead as an operating expense. Since we have removed the replacement reserve for capital assets from the plaintiff's operating expenses, we should in fairness to the plaintiff, credit the plaintiff with an annual operating expense allocation as determined by Flanagan for property components which wear out and require replacement during the remaining life of the improvement. In this area, we find Flanagan's analysis credible, and therefore, we agree with Flanagan's use of 3% of the effective gross income for a replacement reserve. The plaintiff's effective gross income was $1,110,905. Three percent of this income is $33,327. We deduct $33,327 from $450,746 to arrive at a total net operating income of $417,419. Flanagan developed a capitalization rate of 11.6%, and Nadeau developed a capitalization rate of 14.6%. For the purposes of this case, we find it more credible to use a capitalization rate of 14%. With a net operating income of $417,419 and a capitalization rate of 14%, we find the fair market value of the subject property to be $2,981,564. This valuation, which basically uses the plaintiff's own computations without the excessive replacement figure, is in line with the assessor's valuation of $2,968,386.
In tax appeal cases, such as this, the process for determining value is at best, one of approximation. MacLean v.Town of Darien, 43 Conn. App. 169, 173, 682 A.2d 1064, cert. denied, 239 Conn. 943, 686 A.2d 122 (1996), citing ConnecticutCoke Co. v. New Haven, 169 Conn. 663, 667-68, 364 A.2d 178
(1975). Also, it is the plaintiff's burden to prove that the town's valuation was excessive. Ireland v. Wethersfield,242 Conn. 550, 556, 698 A.2d 888 (1997). In this regard, the plaintiff has failed to sustain its burden.
Judgment may enter in favor of the defendant dismissing the CT Page 3855 plaintiff's appeal without costs to either party.
Arnold W. Aronson, J. Judge Trial Referee